Filed 4/21/14  P. v. Gallegos CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>  v.<br><br>PHILLIP ALEX GALLEGOS,<br><br>      Defendant and Appellant. | C070744<br><br>(Super. Ct. No. SF116562A) |

Defendant Phillip Alex Gallegos married a woman who allowed him frequent sexual access to her daughter beginning when she was 12 years old, resulting in two pregnancies.  A jury found defendant guilty of 13 felonies.  (Pen. Code, §§ 261.5, subd. (c), 288, subd. (c)(1), 288.5, subd. (a), 667.61, subd. (d)(6).)[1]  The trial court sent him to prison for 27 years, and he timely appealed.

---

[1] Further undesignated statutory references are to the Penal Code.

Defendant claims that: (1) the trial court should have conducted a second competency hearing, (2) one count was improperly tried in San Joaquin County, (3) no substantial evidence supports the age differential charged as to some offenses, and (4) an enhancement was improperly imposed. We disagree with these claims, but agree with the parties that certain sentencing orders also challenged by defendant should be stricken. We shall modify the judgment and otherwise affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Victim K. testified she was born in October 1992. In 2005 she lived in Modesto with her mother, defendant (her mother's boyfriend since K. was two), her "Nana," her two brothers, and her sister. Defendant first had sex with her when she was 12 or 13. He had vaginal intercourse with her and put his penis in her mouth. K.'s son (A.) was born in September 2006, when she was 13. The sex continued through her pregnancy, with a break when she was four months pregnant, but then "picked up again." Although she suffered morning sickness, she was "pretty ecstatic" about being pregnant by defendant. The labor pains, even with medication, were extreme; labor "felt like forever" and she had a vaginal tear during delivery that required stitches. She lied to the hospital staff, Child Protective Services, and the police, telling them the father was a boy she knew from school, as her mother and defendant had instructed her to say. A nurse who attended the birth testified K. was given fentanyl, a pain medication. The nurse who relieved the first nurse testified K. received an epidural injection for pain control and the labor lasted over 11 hours. K. had "a second degree perineal laceration" which required suturing by the doctor.

When A. was about one, the family moved to Stockton. There, K. slept in the basement with defendant, with her mother's knowledge; in fact, her mother saw K. have sex with defendant and at times directed K. to do so. When K. was 14 and 15, defendant had oral and vaginal sex with her at least two times per week. By the time she turned 16, the frequency went down to about once per week. When she was 17, she got pregnant

2

again. Defendant became angry and violent when he found out she was pregnant, but resumed having sex with her after their daughter (C.) was born in June 2010.

Shortly before K. turned 18, she told defendant she did not want to have sex, and "it would stop for a few days, but then he would make me guilty and made me think that he was the victim and everything, so I agreed to go back with him."

A nurse testified she examined defendant on December 21, 2010, and--over a hearsay objection--she testified she "document[ed]" his date of birth as November 11, 1966, in her report. She identified a photograph of defendant which later was introduced--without objection--as exhibit 1. DNA tests showed defendant fathered A. and C.

The operative information alleged (count 1) continuous sexual abuse (§ 288.5) between October 2005 and October 2006, with great bodily injury (GBI) enhancements under sections 12022.7, subdivision (a) and 667.61, subdivision (d)(6). Counts 2 through 5 alleged lewd acts while the defendant was 10 years older than K. (§ 288, subd. (c)(1)) between October 2006 and October 2007 (two acts of intercourse, two of oral copulation), counts 6 through 9 alleged lewd acts between October 2007 and October 2008 (two acts of intercourse, two of oral copulation), and counts 10-13 alleged unlawful sexual intercourse with a minor more than three years younger (§ 261.5, subd. (c)), two acts when K. was 16 and two when she was 17.

The jury found defendant guilty of all charges.

## DISCUSSION

### I

*Competency to Stand Trial*

Defendant contends the record shows that despite a prior determination that he was competent to stand trial, his subsequent actions reflected by the record show he was not competent to stand trial, and therefore criminal proceedings should have been suspended. (§ 1368). In the section 1368 proceeding, defendant had been found to be malingering, and the trial court confirmed those findings, despite defendant's bizarre

3

actions. On this record, which we describe in detail *post*, we cannot say the trial court was compelled to order another round of psychological testing.

A. *Background*

On August 2, 2011, defense counsel declared a doubt about defendant's competence, and the trial court (Stephenson, J.) suspended criminal proceedings as required by section 1368. A jury trial was waived, and on October 26-27, 2011, a court trial on competency was conducted.

Two doctors found defendant was competent to stand trial. Defendant testified he did not understand the charges or what "prosecution" meant, and repeatedly answered he was there because his attorney had told him he had to be there. He testified he had been diagnosed with "bipolar, post traumatic stress, anxiety, panic disorder [and] agoraphobia" and was a "[p]aranoid schizophrenic." During his testimony, he began talking to an imaginary person in the courtroom, apparently his deceased mother. He described (in a very rambling fashion) physical abuse he suffered as a child at her hands and his father's. Defendant had been receiving disability benefits due to mental problems for about 15 years. Dr. Hart had been nice and Dr. Rogerson had been "the mean one" and the "others" did not like him either, a reference to imaginary people in the courtroom who defendant claimed helped him to speak, and keep him calm, and one of whom acted as defendant's guardian "in armor ready to do battle" to protect him.

Dr. Rogerson testified he had reviewed crime reports and a background letter from defendant's counsel, then interviewed defendant. Defendant claimed to hear voices but "it looked very contrived[.]" "I think he has an average intellectual ability, although at times he attempted to look like he was more impaired." Defendant knew he was charged with sex with K., with whom he had fathered two children. Defendant was malingering and "I felt he did understand the nature and the purpose of the proceedings and that he could rationally assist his counsel in presenting a defense."

4

On October 27, 2011, the court (Villapudua, J.) found defendant competent *and* that he was malingering, and reinstated criminal proceedings.

Defendant later made a number of *Marsden* motions (see *People v. Marsden* (1970) 2 Cal.3d 118), each of which was denied after a hearing. During one such hearing on January 13, 2012, defendant told the court his counsel answered his questions, "but sometimes it doesn't make sense to me." Defendant had wanted a second doctor to testify at the competency hearing. Counsel replied that it was never his intent to call either doctor, even though defendant had a better rapport with Dr. Hart than Dr. Rogerson, and both doctors had found defendant competent. Counsel negotiated a plea offer of 19 years, but defendant rejected it, confirming to the court at the hearing that he had no interest in serving that much time. This *Marsden* hearing was cut short when defendant began to hyperventilate and, as the trial court described it, "just appeared to be totally unaware of his surroundings and unable to organize his thoughts" for "probably five or ten minutes[.]" Defense counsel reported that he had seen this behavior before "and I believe that this is directly related to his mental illness." When defendant returned to the courtroom, the motion was denied.

After the prosecutor returned to the courtroom, the trial court stated in response to defense counsel's comments, "it's a real quandary, I agree with you. However, in looking at the history of this file, it appears he just had this 1368 trial back in -- at the end of October, actually, and he's had two doctors see him. And based on their reports, I can't say that I believe he is 1368 at this point despite what happened earlier today."

On January 18, 2012, defendant appeared in his jail clothes and after the trial court explained that it would be better for defendant to wear the "civilian clothes provided for you" during the trial so the jury would not think he was a "jailbird," defendant replied that he *was* in jail, but eventually said he would change his clothes. Another *Marsden* hearing was then conducted, during which defendant claimed counsel had not fully investigated his mental health records from Stanislaus County, and had failed to ensure

5

he was adequately treated to prevent outbursts such as had occurred at the prior hearing. Defense counsel replied that he had reviewed the mental health records and had hired Dr. Cavanaugh to review the records and evaluate defendant, and had spoken to jail staff about defendant's psychiatric needs. The trial court (Van Oss, J.) credited counsel's statement about having had the records reviewed by Dr. Cavanaugh and having tried to get mental health help for defendant. The trial court stated that had this been the first appearance, "I would probably have found a doubt about his competence myself, quite frankly, giv[en] the picture that he is presenting here as to whether or not he is really capable of cooperating with his attorney. The problem is that we have already gone through that whole procedure just recently, we have two reports here from psychiatrists, again quite capable, well known, fully qualified psychiatrists here in town . . . that have found that Mr. Gallegos here is malingering about his mental condition" and Judge Villapudua had tried the issue and agreed with those opinions.

On January 25, 2012, during a break, defense counsel mentioned defendant "is having a difficult time being here with all the other people. He is trying very hard to keep calm, but you should be aware that he is having a difficult time." The trial court replied that indeed "there are a lot of people [i.e., prospective jurors] in here, we are going to whittle this down, of course, pretty fast, hopefully we'll get it down to just the final jury by tomorrow, but everything is going along fine, so I do appreciate Mr. Gallegos maintaining his composure, so hopefully that will continue."

The next court date, Friday January 27, 2012, outside the presence of the jury and after defendant had been removed from the courtroom, the trial court put on the record that "Mr. Gallegos this morning appears to have had a real meltdown. He was just yelling in the courtroom, and hyperventilating, and making jerky gestures and so forth, and looking very hostile at his attorney, I might say." Defense counsel stated "that's pretty accurate" and "he is just not able to cooperate with me." After some discussion about his medications, the trial court stated: "I don't know how much of this is real and

6

how much is feigned, because of the medical reports that we have here, and so -- but it certainly appears that he is not in a condition, for whatever reason, to cooperate with counsel at this point." The trial court mentioned the possibility of another competency hearing "although we just went through this" and "I've got a feeling we'll do that again and three or four months down the road we'll be right here all over again, so I just don't know how to resolve this."

Defense counsel offered to discuss with defendant what type of evidence was going to be introduced that day and see if that would have "any calming effect on him." After other matters were addressed, defense counsel reported that "he is back there talking to himself and I can't get any response out of him whatsoever" and counsel did not know "what to do with him." The prosecutor stated: "This is the same behavior that he has exhibited since Day 1, so I don't know what the benefit would be to sending him back to 1368." Defendant was brought into court and said he was not "doing good" and could not "deal with this. I can't deal." After he was removed, the trial court stated: "It appears that he said a couple times that he feels that he is having an anxiety attack or a panic attack, and he is making a lot of guttural noises. It's very hard to describe for the record, but a lot of his vocalizations are not understandable and are sort of almost primitive, so something is going on here. I'm not sure what exactly it is, but I don't think we can proceed today, the way it looks." Defense counsel thought it would be a good idea to have Dr. Hart or another doctor talk to defendant "so we know what's going on with him right now, because at least when initially we had the 1368 reports, it was done at a time when there wasn't this sort of stress that was going on with him right now." Counsel referred to a section 4011.6 report, but did not declare a doubt about defendant's competence.[2] The prosecutor represented that defendant had been able to have normal

_____

[2] This statute allows transfer of a prisoner "for treatment and evaluation of possible mental disorder." (*People v. Hightower* (1996) 41 Cal.App.4th 1108, 1111, fn. 1.)

7

conversations with his brother, which had been taped at the jail "for the last year" and "he is absolutely coherent, completely different" than he appears to be in court, and the prosecutor emphasized the two prior medical conclusions that defendant was malingering.

The trial court called the jurors in and dismissed them until the following Tuesday. The court then ordered an examination of defendant pursuant to section 4011.6 "specifically with regard to the status of his medications." Defense counsel had no objection to sharing the prior 1368 reports with other examiners.

On Tuesday, January 31, 2012, defense counsel reported defendant had had a difficult time over the weekend and "is very stressed out." The section 4011.6 evaluation had not been done. When the prosecutor asked about a jail report, the trial court stated "the report that we heard over the weekend was that they could not see him until this morning, and in the meantime, he was acting perfectly normally in the jail over the weekend, so I did get that report." The trial court admonished defendant to calm down and cooperate with his counsel. Later, this occurred:

> "THE COURT: Okay, let's put something on the record here. . . . [W]e are starting this whole scenario all over again, the same situation we had on Thursday -- or Friday, I guess it was. It appears that Mr. Gallegos is working himself up into another crisis here. He is hyperventilating again and shouting out inappropriately and it's very hard for me to tell whether or not he is doing this deliberately or whether it really is some involuntary reaction on his part.
>
> "The problem is that we have been receiving reports from the sheriff and the custodial people that he acts perfectly calmly and normally the rest of the time, it's only when he gets to court and is actually contemplating the evidence beginning that he starts acting up like this and so at this point I am very reluctant --
>
> "THE DEFENDANT: No, it's because I keep my back to them every time."

"THE COURT: Because I think the defendant -- it's possible, anyway, the defendant is doing this intentionally to try to thwart the court process, so we tried to have another psychiatrist look -- see him over the weekend, and that apparently did not get done. They did try to schedule for this morning but we couldn't do that because of the conflict with the court proceedings.

"I am going to tell the clerk to be sure and put on the minute order that we still want to have that done, but in view of the history on this case, I don't think we are going to see much different than what we have already seen, which is, I think, three reports indicating that Mr. Gallegos is either intentionally or unintentionally working himself up into a tizzy, which we just can't permit to go on forever because we've got -- things have got to come to an end at some point or another.

"So if Mr. Gallegos will sit there quietly during the trial and try to cooperate with his attorney, we can go forward. It looks like he has quieted down at this point, although he is still --

"THE DEFENDANT: I have been trying to tell him about this so this wouldn't happen.

"THE COURT: Obviously he is listening to me because he is responding to my comments."

When the trial court told defendant to remain calm or he would have to be restrained, defendant replied, "Fucking restrain me, I don't give a shit. Damn." Defense counsel asserted the stress of the courtroom was different than the stress in the jail and he was concerned how that would appear to the jury. The trial court mentioned that a bailiff had reported that "she asked him about his outburst and he told her that he is better able to hide it when he wants to. Whether there is any truth to that, I don't know, but that's the report we got from the holding cell over there. That's one of the reasons I'm somewhat skeptical about his whole thing." Defense counsel replied he did not know how to interpret that information "but again, it's just sort of a stream of consciousness talking laced with obscenities" and he was concerned about how defendant would appear to the jury. The trial court stated if defendant could not cooperate with counsel "then I suppose we'll do another [13]68" but then added "[O]n the other hand, if it's a situation

9

where he is deliberately not cooperating with counsel, then we cannot allow that to thwart the court process, so we've got to do something here." At no time during this exchange did defense counsel declare a doubt.

Defendant had been swearing throughout. Later, as the prosecutor explained that his witnesses were ready, defense counsel put on the record the fact that defendant was pounding on the table, and the trial court stated: "You know, I really think this is an act. I have to say, in view of the way the defendant is responding to my comments and the way he is going on, I think it's an act. I have to say. [¶] THE DEFENDANT: Go ahead and think that shit. [¶] THE COURT: I don't think a psychiatrist or a psychologist is going to have any better view of what's going on than I do. I don't know. [¶] THE DEFENDANT: Come on. Fuck Dr. Cavanaugh. Come on, whatever your name is, shit, what? Tell me. I wish I was fucking acting."

After commenting that defendant appeared to be rational, the trial court admonished defendant that he would be removed from the courtroom if he did not "stop speaking out and making gestures here while the jury is here." "Is that what you want? [¶] Well, okay. For the record, it appears the defendant is talking to himself and completely ignoring whatever I say to him now." The trial court stated "Again, I have to say, in view of the history of this, I am of the opinion that the defendant is putting this on." After considerable back and forth with the court, defendant indicated that he did not want to be in court, saying: "Remove me. Remove me. I don't want to be here." The trial court agreed to let him leave, but told him that he was welcome to return. When the jury came in, the trial court told the jurors that defendant did not have to be and had chosen not to be present.

After K.'s testimony, the trial court confirmed on the record with the bailiff that defendant had been reminded that he was welcome to return to court to attend trial, but that defendant did not wish to do so. At the beginning of the next court day, the court confirmed that defense counsel had spoken to defendant, who still had not been seen by a

10

doctor, and still did not wish to attend his trial.  The next day, after all testimony had been completed and jury instructions were discussed, defendant appeared in court with counsel outside the presence of the jury.  His counsel represented that he still had not been seen by a doctor, had been given "his medication this morning, but as far as I can tell, he hasn't been given any medication for anxiety, which really seems to be part of the problem of being in the courtroom[.]"

Defendant personally addressed the court.  When the court commented that defendant seemed fine, he said he had "a very major anxiety attack this morning."  His present apparent calmness was due to the fact that he was tired.  After explaining his concerns about testifying, defendant stated:  "I think it would be best if I went so I can go lay down, because my head is feeling really weird to me right now."  Accordingly, he was again removed from the courtroom.

The trial court stated it was clear defendant had emotional problems, but that he was smarter than he let on, and manipulative, and was using his problems "deliberately to get his own way" and there was no need to revisit the issue of his competency.  Defendant was not present for argument or the verdict.

At sentencing, the trial court observed that "the most important thing here is that this defendant knew exactly what he was doing."  "[T]here is no doubt that he's mentally deranged.  He's not -- in any way doesn't meet the standard for 1026 [insanity] or 1368 [competency] at this point, but clearly he has an extraordinary personality defect."

B.  *Analysis*

Under both state law and federal due process principles, a defendant cannot be tried if he or she is not capable of understanding the nature of the proceedings and assisting defense counsel.  (§ 1367; see *People v Lewis* (2008) 43 Cal.4th 415, 524.)

However, " ' "[w]hen a competency hearing has already been held and defendant has been found competent to stand trial . . . a trial court need not suspend proceedings to conduct a second competency hearing unless it 'is presented with a substantial change of

11

circumstances or with new evidence' casting a serious doubt on the validity of that finding." ' " (*People v. Taylor* (2009) 47 Cal.4th 850, 864; see *United States v. Bodey* (9th Cir. 1977) 547 F.2d 1383, 1385-1387 [competency hearing included testimony defendant was feigning illness, no abuse of discretion in not conducting second hearing]; *United States v. Cornejo-Sandoval* (10th Cir. 2009) 564 F.3d 1225, 1234 (*Cornejo-Sandoval*) ["The district court in this case ordered an initial psychiatric examination, provided counsel with an opportunity to supplement the record prior to trial, and entered a finding of competency at a hearing just a few days before trial. . . . '[W]hether to order a second competency exam is a matter wholly within the sound discretion of the trial court' "].)

In this case, the trial court found defendant to be a malingerer during the original competency proceedings (based on two medical opinions). Thereafter, the next trial court (although taking note of defendant's difficulties) repeatedly indicated it credited those findings and also found defendant was feigning incompetency. We review only the cold transcript, and cannot reassess defendant's demeanor: "Reviewing courts give great deference to a trial court's decision whether to hold a competency hearing. ' " 'An appellate court is in no position to appraise a defendant's conduct in the trial court as indicating insanity, a calculated attempt to feign insanity and delay the proceedings, or sheer temper.' " ' " (*People v. Marks* (2003) 31 Cal.4th 197, 220.)

In a recent case involving a defendant's competence to waive counsel, which is tested by the same standards of competency as competence to stand trial, we were presented with a somewhat analogous record where a defendant thwarted the trial court's ability to complete the standard admonishments before granting self-representation. We held in part: "The evidence at the competency hearing indicates that defendant's bizarre motions and objections were not the result of delusions but were intentional efforts to thwart the proceedings. Both of the psychiatrists who examined defendant concluded he was malingering. The fact he continued to make frivolous objections and motions does

12

not mean that his mental condition deteriorated after the competency finding, it simply shows that defendant persisted in his efforts to thwart the proceedings. And, 'once a defendant has been found to be competent, even bizarre statements and actions are not enough to require a further inquiry.' " (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1052 (*Weber*).) Here, as in *Weber*, the fact defendant continued his bizarre behavior does not mean the trial court was required to order an endless series of new competency evaluations.

Because the trial court expressed the view that defendant's medications should be reviewed by medical personnel at the jail, to see if that would help control his outbursts, defendant likens this case to *People v. Westbrook* (1964) 62 Cal.2d 197 (*Westbrook*), stating the section 4011.6 order "can only be explained by the court having a doubt as to appellant's competency." As we explained *ante*, the trial court found defendant was malingering and stated it *did not* doubt defendant's competency. The section 4011.6 order was for a medication review, to ascertain whether defendant could control his behavior in the courtroom and be present during trial to better assist his counsel, not to establish his competency. In contrast, in *Westbrook*, although the trial court received and ordered various mental reports, the trial court never ordered a section 1368 competency hearing, although the record clearly showed the trial court in that case actually doubted Westbrook's competency. (*Westbrook*, *supra*, 62 Cal.2d at pp. 199-201, 203-204 ["the two orders transferring the cause to Department 95 for independent proceedings must have been activated by a doubt as to the defendant's then sanity"]; cf. *People v. Visciotti* (1992) 2 Cal.4th 1, 35-36 ["counsel's request for appointment of experts for the dual purpose of assisting counsel in making a decision on whether to enter a plea of not guilty by reason of insanity and to render an opinion on defendant's competence was preliminary to consideration by counsel, let alone the judge, of whether either had a doubt as to defendant's competence. Neither counsel nor the judge expressed a doubt as to

13

defendant's competence"].) Therefore, the section 4011.6 referral did not equate to a doubt about competency.

Defendant also points to *United States v. Williams* (10th Cir. 1997) 113 F.3d 1155, for the proposition that defendant's courtroom outbursts should have triggered a doubt about his competency. However, as emphasized by a later Tenth Circuit case, no competency hearing was ever held in *Williams*. (*Cornejo-Sandoval*, *supra*, 564 F.3d at p. 1235.) In contrast, here a section 1368 hearing was held and the conclusion was that defendant was malingering. *Williams* does not support defendant's argument that a *second* hearing was required.

As we recently emphasized in *Weber*, *supra*, 217 Cal.App.4th 1041, a defendant cannot be allowed to derail criminal proceedings simply by repeating bizarre behavior, after a competency hearing has shown he is malingering. The record shows the trial court in this case did not err in completing the trial without a second competency hearing.

II

*Jurisdiction over Acts Committed in Stanislaus County*

Defendant contends trial court was without jurisdiction to try count 1--continuous sexual abuse between October 2005 and October 2006--in San Joaquin County, because the consent conferred by the District Attorney (DA) of Stanislaus County on the San Joaquin County DA to prosecute defendant for crimes occurring in Stanislaus County was limited to acts happening between January 1, 2006 and December 31, 2008.

The Stanislaus County DA filed a letter dated February 1, 2011, pursuant to section 784.7, permitting the San Joaquin County DA to prosecute defendant and his wife "for acts occurring on or about and between January 1, 2006 and December 31, 2008 in Stanislaus County[.]' " This letter was filed at the preliminary hearing held on April 12, 2011, over defendant's objection to the presentation of evidence of acts that allegedly occurred in Modesto.

14

Defendant did not raise any further objections to such evidence.  When the prosecutor later suggested amending the information to specify what had happened in Stanislaus County, defense counsel stated:  "It's fine with me if you want to add it, but I'm not going to object to it."  After further discussion, the trial court stated "the court has jurisdiction over the entire state, so I don't know why there is any need to change the information at all" and if the jury asked about the issue "I'll tell them that this county is authorized to proceed on this matter, but other than that, I don't see any reason why we should even bring it up."  Defense counsel did not object, or even comment after the court's statement.

Section 784.7, subdivision (a) provides as follows:

> "When more than one violation of Section 220, except assault with intent to commit mayhem, 261, 262, 264.1, 269, 286, 288, 288a, 288.5, or 289 occurs in more than one jurisdictional territory, the jurisdiction of any of those offenses, and for any offenses properly joinable with that offense, is in any jurisdiction where at least one of the offenses occurred, subject to a hearing, pursuant to Section 954, within the jurisdiction of the proposed trial.  At the Section 954 hearing, the prosecution shall present evidence in writing that all district attorneys in counties with jurisdiction of the offenses agree to the venue. *Charged offenses from jurisdictions where there is no written agreement from the district attorney shall be returned to that jurisdiction*."  (Emphasis added.)

Defendant reads the emphasized language to require a written agreement from Stanislaus County specifically delineating count 1 for the San Joaquin County DA to prosecute.  But the Stanislaus County DA plainly consented to having defendant's entire case tried in San Joaquin County, and, had defendant made this same argument after the information was filed, would undoubtedly have supplied an amended authorization letter.  By not renewing his objection after the preliminary hearing--and specifically declining to object--defendant precluded the Stanislaus County DA from considering whether and how to exercise discretion, that is, whether to try part of the case or more likely simply provide an expanded authorization letter.  Because defendant did not object after the

15

preliminary hearing, he has forfeited his claim that the trial court lacked territorial jurisdiction. (See *People v. Remington* (1990) 217 Cal.App.3d 423, 428-431.)[3]

Nor does the argument that any deficiency in the authorization letter divests the trial court of "fundamental" jurisdiction, such that defendant's claim cannot be forfeited or waived, persuade. "In California, a superior court has subject matter jurisdiction with regard to any felony offense committed within the state, no matter where the offense was committed." (*People v. Simon* (2001) 25 Cal.4th 1082, 1097, fn. 8; see *People v. Posey* (2004) 32 Cal.4th 193, 207-208 [venue does not implicate fundamental jurisdiction]; *People v. Gbadebo-Soda* (1995) 38 Cal.App.4th 160, 169-171 [failure to renew venue or vicinage objections at trial forfeits such claims, citing, inter alia, *Remington*].)

## III

### *Proof of Defendant's Age*

Defendant contends inadmissible evidence was used to prove his age. He first cites his statement to a nurse that he was born on September 11, 1966, a statement she then documented in her report. His statement was a party admission and therefore was not inadmissible hearsay, as defendant contends. (Evid. Code, § 1220; see *People v. Horning* (2004) 34 Cal.4th 871, 898.)

_____

[3] Defendant's claim that *Remington* was decided during the pre-unification existence of Municipal and Superior Courts, and therefore is no longer good law, is forfeited because it was not made in the opening brief, thereby depriving the People of the chance to respond to it. (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 29.) In any event, no court has questioned *Remington*'s holding, and this court and other courts have held, albeit in other contexts, that the general rule that preliminary hearing objections have to be renewed at trial was not altered by court unification. (See, e.g*., People v. Witcraft* (2011) 201 Cal.App.4th 659, 665-666; *People v. Richardson* (2007) 156 Cal.App.4th 574, 586-589; *People v. Hinds* (2003) 108 Cal.App.4th 897, 900.) If we were to reach defendant's claim, we would find no reason to alter this general rule, in the context of the need for an authorization letter.

Defendant next contends this evidence violated the confrontation clause of the Sixth Amendment to the United States Constitution. He contends his hearsay objection preserved the Sixth Amendment claim now raised. We disagree and find his claim forfeited for lack of a timely and specific Sixth Amendment objection. (Evid. Code, § 353, subd. (a); see *People v. Burgener* (2003) 29 Cal.4th 833, 869 [hearsay objection did not preserve confrontation clause claim]; *People v. Chaney* (2007) 148 Cal.App.4th 772, 779-780 ["A *Crawford* [i.e., confrontation clause] analysis is distinctly different than that of a generalized hearsay problem"; point forfeited]; but see *People v. Cowan* (2010) 50 Cal.4th 401, 503 [assuming without deciding that a hearsay objection preserved a confrontation clause claim].)

In any event, although defendant argues the information regarding his date of birth was contained in a forensic report and was from an "unknown source" to strengthen his confrontation clause argument (see *People v. Dungo* (2012) 55 Cal.4th 608 [discussing "testimonial" nature of reports as implicated by the confrontation clause]), he mischaracterizes the evidence. The clear import of the nurse's testimony was that *defendant told her his birth date*, which she *then* documented in her report. Defendant's statements are not vulnerable to a confrontation clause challenge, as a defendant has a right to confront *witnesses* against him, not confront himself. (See *People v. Jennings* (2010) 50 Cal.4th 616, 661-662.) There was no error.

IV

*Great Bodily Injury Finding*

Defendant correctly contends the jury was not asked to find whether he committed GBI *within the meaning of section 12022.7*, as charged as to count 1, continuous sexual abuse, but was instructed on and found true an allegation of GBI (pregnancy) *within the meaning of section 667.61* a one strike statute, as also charged as to count 1.

After trial, defendant moved to strike the section 667.71 allegation, because that statute did not take effect until after acts comprising count 1 were committed. The

17

People conceded the point, but disagreed as to whether the trial court could deem the verdict to reflect a section 12022.7 enhancement. The trial court found that because the section 12022.7 enhancement was pleaded in the information, and its elements were submitted to and found true by the jury, and because it had the same elements as the One Strike finding, "the misnumbering of the section, I don't think is a material difference. [¶] So the Court is going to find that the defendant should be sentenced under 12022.7 for the great bodily injury enhancement."

We agree with the trial court.

The One Strike statute incorporates the definition of GBI used in section 12022.7. Section 667.61, subdivision (d)(6) applies where, inter alia, "The defendant personally inflicted great bodily injury on the victim . . . in violation of Section . . . 12022.7[.]"

The trial court instructed the jury that: "Great bodily injury means significant or substantial physical injury. It is an injury that is greater than minor or moderate harm. [¶] Committing the crime of continuous sexual abuse of a minor as just defined is not by itself the infliction of great bodily injury. A resulting pregnancy may or may not constitute great bodily injury. You are the exclusive judges of whether the defendant personally inflected great bodily injury based on these instructions. [¶] The defendant must have applied substantial force to [the victim]. If that force could not have caused or contributed to the great bodily injury, then it is not substantial. [¶] The People have the burden of proving each allegation beyond a reasonable doubt. If the People have not met this burden, you must find the allegation has not been proved."

That is the same instruction used for section 12022.7, CALCRIM No. 3160, except for the portion stating that pregnancy does not of itself equate to GBI, an instruction favorable to defendant. (See *People v. Cross* (2008) 45 Cal.4th 58, 65-66 [rejecting contention that pregnancy without medical complications that results from nonforcible but unlawful intercourse can never support GBI finding]; *People v. Meneses*

18

(2011) 193 Cal.App.4th 1087, 1091 [long delivery and pain during delivery experienced by 12-year-old victim supported GBI].)

The prosecutor argued the 11 hours of often painful labor requiring drugs, the many weeks of morning sickness, and the vaginal laceration, incident to the birth of A. when the victim was 13 years old, constituted great bodily injury. The defense argument emphasized the People's high burden of proof.

Omitting internal quotations and citations, the following general rule applies:

> "A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court. The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. There are innumerable authorities which declare that the form of the verdict is immaterial if the intention to convict of the crime charged is unmistakably expressed." (*People v. Camacho* (2009) 171 Cal.App.4th 1269, 1272-1273; see *People v. Bolin* (1998) 18 Cal.4th 297, 330-331.)

This view is supported by statutory authority, as well: "Neither a departure from the form or mode prescribed by this code in respect to any pleading or proceeding, nor an error or mistake therein, renders it invalid, unless it has actually prejudiced the defendant, or tended to his prejudice, in respect to a substantial right." (§ 1404.) We "must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." (§ 1258.)

Here, the jury found beyond a reasonable doubt that defendant impregnated the victim, causing a difficult labor which satisfied the GBI standards. The fact that a technically incorrect code section was referenced in the instructions and verdict changes neither the fact that defendant had notice of the 12022.7 enhancement in the amended information, nor the fact that the jury was properly instructed on its elements.

This case is distinguished from those cases cited by defendant in his briefing, where the instructions on the relevant finding were defective, or the relevant factual issue

19

was not submitted to the jury. Here the error in the verdict form is wholly nonprejudicial and essentially typographical.

Under these circumstances, reversal is not required. (See *People v. Neal* (1984) 159 Cal.App.3d 69, 72-74 [Neal had adequate notice of enhancement and suffered no prejudice], approved on this point in *People v. Thomas* (1987) 43 Cal.3d 818, 830-831.) As we held in a case involving a defective verdict, where "mere technical error has been established only academically, and in addition there is a complete lack of any showing of prejudice, we must conclude that the contention so raised by defendant is not well taken." (*People v. Foogert* (1948) 85 Cal.App.2d 290, 299.) Here, had the verdict form contained the number "12022.7" instead of "667.71" nothing would have changed. The same instructions would have been given, the same arguments would have been made, and the jury would have evaluated the same evidence in the same way. (See *People v. Jones* (1997) 58 Cal.App.4th 693, 716 [defective verdict harmless even under federal prejudice standard because the jury "resolved the factual question posed adversely to defendant under other, properly given instructions"].)

V

*Ancillary Sentencing Orders*

Defendant contends, and the People concede, that the trial court lacked authority to impose "no contact" and "no visitation" orders as to the now-adult victim. We agree. (See *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1478; cf. § 1202.05.)

Defendant also contends, and the People concede, that the trial court ordered an unauthorized discretionary sex offender registration order (§ 290.006) *after* having imposed a mandatory sex offender registration order at the original sentencing hearing. Because defendant remains a lifetime sex registrant based on the mandatory order (see § 290, subd. (b)), the discretionary sex offender order is duplicative and therefore unnecessary; further, it was imposed after defendant's appeal was pending.

20

Finally, the parties agree, as do we, that the trial court lacked authority to retain jurisdiction over victim restitution after ordering a specific restitution amount at sentencing.  (See §§ 1202.4, subd. (f), 1204.46.)

We shall modify the judgment to strike each of these orders.

VI

*Presentence Credits*

Defendant was arrested late on the night of December 20, 2010, but not actually jailed until December 21, 2010.  He seeks one day credit for the partial day he was *bound for* but not actually *in* jail.  By statute, defendant was entitled to credit for time "in custody, including, but not limited to, any time spent in a jail, camp, work furlough facility . . . or similar residential institution[.]"  (§ 2900.5, subd. (a).)  The statute does not grant credit for time a person is merely under arrest.  (See *People v. Macklem* (2007) 149 Cal.App.4th 674, 702 ["credit for time served commences on the day a defendant is booked into custody"].)

**DISPOSITION**

The judgment is modified by striking the no contact, no visitation, discretionary sex offender registration, and reservation of restitution jurisdiction orders.  As modified, the judgment is affirmed.  We direct the trial court to prepare an amended abstract of judgment reflecting these modifications and to forward a certified copy to the Department of Corrections and Rehabilitation.


                                                              DUARTE              , J.

We concur:


        BLEASE              , Acting P. J.


        HOCH              , J.

21